Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Michael Schnepper (MS 6953)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and
GEICO CASUALTY CO.,

Docket No.:
1:14-cv-05473-SJ-RER

Plaintiffs,

-against-

**Plaintiff Demands a Trial by Jury**

NEW YORK DIAGNOSTIC MEDICAL CARE P.C.,
ELEANOR LIPOVSKY, M.D.,
LEONID RUBIN a/k/a LEONARD RUBIN,
ALTA ENTERPRISES, INC.,
AMOS WEINBERG, and
JOHN DOE DEFENDANTS 1-10.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## AMENDED COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Amended Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $665,000.00 that the Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges for radiology services (primarily magnetic resonance imaging, or "MRIs")(the "Fraudulent Services") that purportedly were provided to New York automobile accident victims ("Insureds").

2.     Moreover, this action seeks to recover more than $250,000.00 in legal fees and disbursements that the Defendants caused GEICO to incur through their fraudulent attempts to collect on their charges for the Fraudulent Services.

3.     In addition, GEICO seeks a declaration that it is not legally obligated to pay at least $1,500,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendant New York Diagnostic Medical Care, P.C. ("NY Dx") because:

(i)     NY Dx was fraudulently incorporated, unlawfully licensed, and illegally owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(ii)    NY Dx engaged in illegal fee-splitting with non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iii)   NY Dx nominally was owned on paper by physicians who did not actually practice medicine through the professional corporation and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iv)    NY Dx sold and assigned its right to collect no-fault insurance benefits to unlicensed non-physicians and, therefore, lacks standing to bill for or to collect no-fault insurance benefits; and

(v)     the Fraudulent Services – to the extent that they were performed at all – were performed by independent contractors, rather than by NY Dx's employees.

4.     The Defendants fall into the following categories:

(i)     Defendant NY Dx is a fraudulently incorporated medical professional corporation through which the Fraudulent Services purportedly were performed and were billed to GEICO and other automobile insurance companies.

2

(ii) Defendant Eleanor Lipovsky, M.D. ("Lipovsky") is a licensed physician who falsely purported to own and control NY Dx.

(iii) Defendants Leonid Rubin a/k/a Leonard Rubin ("Rubin"), Alta Enterprises, Inc. ("Alta"), and John Doe Defendants 1-10 (collectively the "Management Defendants") are not and never have been licensed as physicians. Even so, the Management Defendants secretly owned, controlled, and derived economic benefit from NY Dx in contravention of New York law.

(iv) Defendant Amos Weinberg ("Weinberg") is a New York attorney who was one of the primary drivers of the Defendants' fraudulent scheme. In conjunction with the Management Defendants, Weinberg knowingly and falsely represented that he was the attorney for NY Dx, that he had the authority to commence litigation to pursue collection of no-fault insurance benefits on behalf of NY Dx, and that NY Dx was eligible to collect no-fault insurance benefits in the first instance. Then, again in conjunction with the Management Defendants, Weinberg acted to fraudulently conceal the Defendants' scheme.

5. As discussed herein, the Defendants at all relevant times have known that:

(i) NY Dx was fraudulently incorporated, unlawfully licensed, and illegally owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(ii) NY Dx engaged in illegal fee-splitting with non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iii) NY Dx nominally was owned on paper by physicians who did not actually practice medicine through the professional corporation and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iv) NY Dx sold and assigned its right to collect no-fault insurance benefits to unlicensed non-physicians and, therefore, lacks standing to bill for or to collect no-fault insurance benefits; and

(v) the Fraudulent Services – to the extent that they were performed at all – were performed by independent contractors, rather than by NY Dx's employees.

6. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through NY Dx. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7.     The Defendants' scheme began as early as 2008 and – in light of the Defendants' efforts to fraudulently conceal the scheme – it has continued uninterrupted since that time.

8.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $915,000.00.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

#### A.     NY Dx

10.     Defendant NY Dx is a putative New York medical professional corporation with its principal place of business in Brooklyn, New York. NY Dx was fraudulently incorporated on May 9, 2008, purportedly was owned on paper by Lipovsky and thereafter by another licensed physician, Carmen Olmedo, M.D. ("Olmedo"), but in actuality always was secretly and unlawfully owned and controlled by the Management Defendants.

#### B.     Lipovsky

11.     Defendant Lipovsky resides in and is a citizen of New York. Lipovsky is a physician who was licensed to practice medicine in New York on July 1, 1985, and who purported to own and practice medicine through NY Dx.

12.     Though NY Dx purported to specialize in the performance of radiology services, in particular MRIs, Lipovsky is not and never has been a radiologist, nor has she been board certified

in any other medical specialty. Rather, Lipovsky is a non-board certified internist, with no significant specialty training in radiology or the performance or interpretation of MRI studies.

13.     Lipovsky repeatedly has been subjected to professional discipline by the New York State Board for Professional Medical Conduct (the "State Board") based on her unethical, fraudulent, and/or criminal activities.

14.     For instance, pursuant to an order dated August 13, 1996, the State Board suspended Lipovsky's medical license for five years, stayed the suspension, placed Lipovsky on probation for five years, and ordered Lipovsky to perform 250 hours of community service after determining that Lipovsky had pleaded guilty in the Supreme Court, New York County to criminal facilitation and had been sentenced to a one year conditional discharge and community service. A copy of the State Board's August 13, 1996 order and the underlying charges is annexed hereto as Exhibit "2".

15.     In particular, Lipovsky had written fraudulent notes for patients falsely stating that the patients were disabled, so that the patients could obtain half-fare discounts on Metropolitan Transportation Authority subway and rail lines. See Exhibit "2".

16.     In late 2004, Lipovsky once again was subjected to professional discipline by the State Board, again based on her creation of a phony medical record. Specifically, pursuant to an order dated November 19, 2004, the State Board censured Lipovsky, reprimanded Lipovsky, placed Lipovsky on probation for two years, and fined Lipovsky $10,000.00 after determining that Lipovsky willfully had written a false note on the letterhead of a different physician that had not been authorized by the physician. A copy of the State Board's November 19, 2004 order and the underlying charges is annexed hereto as Exhibit "3".

17.     Unchastened, Lipovsky once again was disciplined by the State Board in mid-2014,

after the State Board determined that Lipovsky – on January 4, 2010 – once again had pleaded guilty to criminal facilitation. Specifically, pursuant to an order dated May 29, 2014, the State Board censured, reprimanded, and fined Lipovsky after determining that she had pleaded guilty to criminal facilitation on January 4, 2010 in the Supreme Court, Kings County. A copy of the State Board's May 29, 2014 order and the underlying charges is annexed hereto as Exhibit "4".

18.  What is more, on or about September 21, 2007, in a case entitled <u>People of the State of New York v. Kagan, et al.</u> (the "Kagan Action"), a grand jury in the Supreme Court, Kings County indicted Lipovsky for a large number of crimes, including multiple counts of grand larceny, insurance fraud, and falsifying business records, in connection with a no-fault insurance fraud scheme similar to the scheme in the present case. A copy of the indictment in the Kagan Action is annexed hereto as Exhibit "5".

19.  In the Kagan Action, Luke Johnson ("Investigator Johnson"), an Investigator in the Auto Insurance Fraud Unit of the Criminal Division of the New York State Attorney General's Office, executed an affidavit in support of the Attorney General's application for an ex parte order of attachment against Lipovsky, among others. A copy of the affidavit is annexed hereto as Exhibit "6".

20.  In the affidavit, Investigator Johnson swore to facts indicating – among other things – that:

> (i)  an unlicensed non-physician named Jacob Kagan ("Kagan") illegally owned and controlled several no-fault insurance clinics in Brooklyn, Queens, and Staten Island;
>
> (ii)  Lipovsky served as the nominal or "paper" owner of one of the medical professional corporations that operated at Kagan's clinics;
>
> (iii)  in order to provide a false justification for the laundry-list of medically-unnecessary and illusory "treatments" that supposedly were provided to no-fault Insureds at Kagan's clinics, Lipovsky conducted cursory evaluations

6

of the Insureds, made medically-unnecessary referrals, and then submitted reports to insurers containing fabricated symptoms and diagnoses; and

(iv) at one of Kagan's clinics, Lipovsky was caught on a wiretap attempting to coach an "Insured" – actually, an undercover investigator – to report injuries and psychological symptoms that the "Insured" denied experiencing, and then referred the "Insured" for psychological treatment at Kagan's clinic despite the "Insured's" denial of any psychological symptomatology.

See Exhibit "6".

21.     On January 4, 2010, Lipovsky pleaded guilty to criminal facilitation in the Kagan Action, and it was Lipovsky's guilty plea in the Kagan Action that led to the State Board's decision to discipline her for the third time on May 29, 2014. See Exhibit "4".

22.     For instance, though the State Board's May 29, 2014 order does not specify the index number of the criminal case in which Lipovsky pleaded guilty to criminal facilitation:

(i) the State Board's May 29, 2014 order does specify that the guilty plea was entered in the Supreme Court, Kings County on January 4, 2010, where the Kagan Action was then pending;

(ii) at the time, the Kagan Action was the only criminal action pending against Lipovsky in the Supreme Court, Kings County; and

(iii) one of Lipovsky's co-Defendants in the Kagan Action, Alexandra Gashinskaya, M.D. ("Gashinskaya") – who like Lipovsky was alleged to have served as the nominal or "paper" owner of one of the medical professional corporations that operated at Kagan's clinics, and to have fabricated treatment reports at Kagan's clinics – also was permitted to plead guilty to criminal facilitation in the Kagan Action. A copy of Gashinskaya's plea agreement is annexed hereto as Exhibit "7". See also Exhibit "6".

23.     Upon information and belief, Lipovsky and Gashinskaya were permitted to plead guilty to the lesser charge of criminal facilitation in exchange for their cooperation against Kagan.

## C.     The Management Defendants

24.     Defendant Rubin resides in and is a citizen of New York. Rubin is not and never has been a licensed physician, yet owned, controlled, and derived economic benefit from NY Dx in

contravention of New York law.

25.     Defendant Alta is a New York corporation with its principal place of business in New York. Alta was incorporated on September 16, 2003, was owned and controlled by Rubin, and was used by Rubin to illegally own and control NY Dx, and to siphon insurance profits generated by NY Dx to non-physicians.

26.     Upon information and belief, John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed as physicians, yet – together with Rubin and Alta – have owned, controlled, and derived economic benefit from NY Dx in contravention of New York law, and have split fees with NY Dx in contravention of New York law.

**D.     Weinberg**

27.     Defendant Weinberg resides in and is a citizen of New York. Weinberg is an attorney who was licensed to practice law in New York on May 24, 1978.

28.     Like Lipovsky, Weinberg repeatedly has been subjected to professional discipline. For instance, on April 18, 1997, the Grievance Committee for the Tenth Judicial District (the "Grievance Committee") issued a letter of caution to Weinberg for failing to provide one of his clients with the written retainer required by all attorneys retained in a contingent fee matter and for settling a collection matter without the permission of his client. See Matter of Weinberg, 25 A.D.3d 157 (2d Dep't 2005). The Grievance Committee noted that only the relatively low dollar amount of the settlement avoided the issuance of a more severe sanction. Id.

29.     On June 20, 1997, the Grievance Committee issued a second letter of caution to Weinberg for failing to provide his client with a retainer agreement as required in a contingent fee arrangement. See Weinberg, supra.

30.     On June 30, 2000, the Grievance Committee issued yet another letter of caution to Weinberg, this time for communicating with a represented party despite clear instructions to cease such communication, in violation of Code of Professional Responsibility DR 7-104(a)(1) (22 NYCRR 1200.35(a)(1)). See Weinberg, supra.

31.     On September 18, 2001, the Grievance Committee issued a letter of admonishment to Weinberg, based on his failure to advise a putative debtor that there was no valid debt and, therefore, no merit to certain litigation Weinberg had threatened. See Weinberg, supra.

32.     Then, in a decision and order dated October 31, 2005, the Appellate Division, Second Department suspended Weinberg's license to practice law for one year. See Weinberg, supra. The Appellate Division's decision was based on its determination that Weinberg had:

(i)     neglected various legal matters entrusted to him, in violation of Code of Professional Responsibility DR 6-101(a)(3) (22 NYCRR 1200.30(a)(3));

(ii)    engaged in conduct adversely reflecting on his fitness as a lawyer by – among other things – permitting one of his employees, who was not licensed as an attorney, to hold herself out as an attorney during the course of her employment with him; and

(iii)   failed to properly preserve funds entrusted to him in escrow, in violation of Code of Professional Responsibility DR 9-102 (a)(22 NYCRR 1200.469a)).

See Weinberg, supra.

33.     What is more, this is not the first time in which Weinberg has purported to represent a healthcare provider/purported client without any actual authority to do so.

34.     For instance, in Park Health Ctr. v. Country-Wide Ins. Co., 2 Misc. 3d 737 (Civ. Ct. Queens Cty. 2003), Weinberg purported to represent various healthcare providers in an action to recover no-fault insurance benefits from an insurer. Id., 2 Misc. 3d at 738-739. After the action was dismissed, the insurer sought sanctions against Weinberg, and showed, among other

things, that: (i) two of the plaintiff-providers had never authorized Weinberg to represent them; (ii) another of the plaintiff-providers was deceased and his estate was subject to bankruptcy; (iii) Weinberg could not demonstrate that he actually had authority to represent several of the other providers; and (iv) when given the chance to explain himself to the court, Weinberg refused to appear until a contempt order was issued against him. Id., 2 Misc. 3d at 738-742.

35.   In its order sanctioning Weinberg, the Park Health Ctr. Court noted:

the improprieties of the officer of the court and his sordid conduct leading to months of hearings and motions. It is this relationship that lays at the heart of Mr. Weinberg's sanctionable conduct. He abdicated his responsibility as an officer of the court, and in so doing permitted a number of meritless and baseless actions to go forward, forcing both defendant and the court to expend enormous energy, time and resources. He admitted that he never signed any of the documents that came before the court bearing his signature, including verifications and affirmations. … Weinberg abdicated his responsibility … by never confirming any of the "facts" or "clients." He never once spoke with his "clients" to verify the claim or the very existence of either the clients or the claim.

This failure to adequately represent his "clients" is made clear by the evidence that Mr. Weinberg was unaware that his "client" Dr. Koven was deceased. While it is still questionable whether Dr. Koven ever retained Mr. Weinberg independently or through Dr. Abraham, the fact that Dr. Koven's bankruptcy and subsequent death went undetected by Mr. Weinberg for a significant period of time indicates his dereliction of legal duty. Further, after the initial conference before this court when the truth about the deceased Dr. Koven was "discovered," Mr. Weinberg nevertheless entered judgment on Dr. Koven's behalf in another matter.

Had Mr. Weinberg or his employees taken the time to review the documents or interview the purported clients at the inception of the action or at any time during the next five years, the enormous effort of both defendant and the court would not have been expended. Instead, defendant was forced to locate and investigate the "plaintiffs" in this matter and through such labor discovered two plaintiffs had never heard of Mr. Weinberg and did not authorize him to represent them in this matter. None of the underlying documents supported any cause of action on behalf of Park Health and a simple review of the documents furnished would have eliminated that plaintiff without extensive discovery and motion practice undertaken by defendant.

When given the opportunity to come before this court to explain the apparent lack of merit and inconsistencies exposed by defendant, Mr. Weinberg flouted the

authority of the court by failing to appear. Instead, Mr. Weinberg only appeared before the court once a contempt order was issued against him. … Upon appearing in court, Mr. Weinberg failed to present even a scintilla of evidence to prove his authority to act on behalf of the "plaintiffs." Mr. Weinberg did not produce even one document in admissible form, nor introduce a single affidavit. Further, no attempt at all was made to prove any link between attorney Weinberg and client Dr. Choi. Significantly, the instant action was marked ready for trial. Five years is indeed ample opportunity for counsel to get it right.

Id., 2 Misc 3d at 741-742.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

37.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

38.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

39.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.      **An Overview of the No-Fault Laws and Licensing Statutes**

40.     GEICO underwrites automobile insurance in New York.

41.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that

they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

42.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

43.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

44.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

45.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

46.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

12

47.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.

48.     Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

49.     Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed.

50.     Therefore, under the No-Fault Laws, a professional corporation is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it is owned by a physician who does not actually practice medicine through it.

51.     What is more, pursuant to New York law, to be properly licensed, medical professional corporations must – among other things – file triennial statements with the Education Department "listing the name and residence address of each shareholder, director and officer of such corporation and certifying that all such individuals are authorized by law in this state to practice a profession which such corporation is authorized to practice. The statement shall be signed by the president or any vice-president of the corporation and attested to by the secretary or any assistant secretary of the corporation." N.Y. Bus. Corp. Law § 1514.

52.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

53.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

54.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

55.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a

crime.

## II.        The Defendants' Fraudulent Scheme

56.        Beginning in 2008, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which NY Dx – a professional corporation nominally owned on paper by Lipovsky and Olmedo but actually illegally owned and controlled by the Management Defendants – was used to bill the New York automobile insurance industry millions of dollars that it never was eligible to receive.

### A.        The Fraudulent Incorporation and Operation of NY Dx

57.        In early 2008, the Management Defendants commenced a search for a licensed physician who would be willing to sell the use of her medical license to them so that they could fraudulently incorporate a medical professional corporation and use it to submit large-scale fraudulent no-fault insurance billing to insurers.

58.        In early 2008, the Management Defendants recruited Lipovsky, a licensed physician who was willing to sell the use of her medical license to them so that they could fraudulently incorporate NY Dx.

59.        Lipovsky was receptive to the Management Defendants' offer to serve as the front for their unlawful scheme because she lacked board certification in any medical specialty, repeatedly had been subjected to professional discipline, and therefore her prospects for highly remunerative medical employment were limited.

60.        Lipovsky also was receptive to the Management Defendants' offer to serve as the front for their unlawful scheme because she recently had been indicted in the Kagan Action, was being sued for large sums by State Farm Mutual Insurance Company for many of the same activities giving rise to the Kagan Action in a lawsuit entitled <u>State Farm Mutual Insurance</u>

Company v. Grafman, et al., E.D.N.Y. Docket No. 1:04-cv-02609-NG-SMG, and was in need of cash to fund her defense of the criminal and civil actions.

61.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing NY Dx to operate a medical practice, the Management Defendants entered into a secret scheme with Lipovsky. In exchange for a designated salary or other form of compensation from the Management Defendants, in mid-2008 Lipovsky agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the triennial statements filed thereafter, that she was the true shareholder, director and officer of NY Dx and that she truly owned, controlled and practiced through the professional corporation.

62.     Once NY Dx was fraudulently incorporated on May 9, 2008, Lipovsky ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

63.     The Management Defendants – rather than Lipovsky – provided all start-up costs and investment in NY Dx. Lipovsky did not incur any costs to establish NY Dx's practice, nor did she invest any money in the professional corporation she purportedly owned.

64.     Thereafter, the Management Defendants caused NY Dx to commence operations at 198 Foster Avenue, Brooklyn, New York (the "198 Foster Avenue Location") – a location that the Management Defendants controlled.

65.     Lipovsky never was the true shareholder, director, or officer of NY Dx, and never had any true ownership interest in or control over the professional corporation. True ownership and control over NY Dx always rested entirely with the Management Defendants, who used the façade of NY Dx to do indirectly what they were forbidden from doing directly, namely: (i) employ

physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

66.     Lipovsky exercised absolutely no control over or ownership interest in NY Dx. All decision-making authority relating to the operation and management of NY Dx was vested entirely with the Management Defendants.

67.     In addition, Lipovsky never controlled or maintained any of NY Dx's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of NY Dx's financial affairs; never hired or supervised any of NY Dx's employees or independent contractors; and was completely unaware of the most fundamental aspects of how NY Dx operated.

68.     In keeping with the fact that Lipovsky exercised no genuine ownership interest in or control over NY Dx, she never actually practiced medicine through the professional corporation.

69.     For instance, none of the thousands of fraudulent no-fault insurance charges submitted through NY Dx to GEICO were for medical services provided by Lipovsky. Rather, all of the thousands of fraudulent no-fault insurance charges submitted through NY Dx to GEICO were for radiology services that were provided – to the extent that they were provided at all – by radiologists whom the Defendants treated as independent contractors.

70.     Indeed, Lipovsky could not have actually performed any of the services that were provided through NY Dx, because all of the services provided through NY Dx were radiology services, and Lipovsky – who is an internist, not a radiologist – lacked the training and education necessary to perform radiology services.

71.     Furthermore, Lipovsky could not have supervised any of the radiologists who did perform – or who purported to perform – radiology services on behalf of NY Dx, because, as a

non-radiologist, she lacked the training and education necessary to supervise the performance of radiology services.

72.     Lipovsky did not even have the elementary training in MRI use that some physicians receive in medical school. Rather, Lipovsky attended medical school in the Soviet Union, at the Leningrad Institute of Technology, and graduated in 1973 – years before MRIs became available for diagnostic use, much less a part of any medical school curriculum.

73.     To conceal their true ownership and control of NY Dx while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Lipovsky and NY Dx enter into a series of "management," "billing," "marketing," and "lease" agreements with themselves.

74.     These agreements called for exorbitant payments from NY Dx to the Management Defendants, for the lease of space and equipment at the 198 Foster Avenue Location, and for the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of NY Dx's business; or (ii) the income generated by the professional corporation.

75.     While these agreements ostensibly were created to permit the Management Defendants to provide "management," "billing," and "marketing," services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own NY Dx; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through NY Dx.

76.     The net effect of these "management," "billing," "marketing," and "lease" agreements between Lipovsky, NY Dx, and the Management Defendants was to maintain NY Dx

in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

**B.** **The Fraudulent "Transfer" of NY Dx From Lipovsky to Olmedo**

77.     As noted above, on January 4, 2010, Lipovsky pleaded guilty to criminal facilitation in connection with the Kagan Action.

78.     Upon information and belief, in exchange for permitting Lipovsky to plead guilty to a lesser charge of criminal facilitation, the Attorney General required – among other things – that Lipovsky agree to never again treat no-fault insurance patients, and to never again present any claims for no-fault insurance reimbursement.

79.     For instance, Gashinskaya – who was charged with essentially the same conduct and crimes in the Kagan Action as Lipovsky, and who was permitted to plead guilty to the lesser charge of criminal facilitation a few months prior to Lipovsky's guilty plea – also had to agree to never again treat no-fault insurance patients, and to never again present any claims for no-fault insurance reimbursement. See Exhibit "7".

80.     By late 2009, the Management Defendants had caused more than $2,000,000.00 in no-fault insurance billing to be submitted through NY Dx to GEICO, most of which remained pending and unpaid.

81.     Upon information and belief, by late 2009 the Management Defendants had caused millions of dollars in additional no-fault insurance billing to be submitted through NY Dx to other New York automobile insurers, most of which likewise remained pending and unpaid.

82.     Upon information and belief, in late 2009, Lipovsky advised the Management Defendants of her plea negotiations with the Attorney General, and told the Management

Defendants that – in exchange for permitting her to plead guilty to a lesser charge of criminal facilitation – the Attorney General would require Lipovsky to agree to never again treat no-fault insurance patients, and to never again present any claims for no-fault insurance reimbursement.

83.     The Management Defendants grew concerned that Lipovsky's impending plea deal with the Attorney General would cut off their ability to collect on the millions of dollars in pending billing that they had submitted, or caused to be submitted, through NY Dx.

84.     Accordingly, the Management Defendants entered into a complex scheme designed to enable them to continue to pursue collection on the NY Dx billing, notwithstanding Lipovsky's impending plea deal in the Kagan Action and her concomitant agreement not to present any further claims for no-fault insurance reimbursement.

85.     As an initial step in the scheme, the Management Defendants recruited a second licensed physician – Olmedo – who, like Lipovsky, was willing to pose as the nominal or "paper" owner of NY Dx, while in actuality ceding true ownership and control over the professional corporation to the Management Defendants.

86.     Olmedo was receptive to the Management Defendants' offer to replace Lipovsky as the front for their unlawful scheme because she was seriously ill, not of sound mind, and in financial straits.

87.     On December 30, 2009, in exchange for a designated salary or other form of compensation from the Management Defendants, Olmedo agreed to sign a phony "Stock Purchase Agreement", which falsely recited that she would purchase Lipovsky's purported ownership interest in NY Dx – including all of its accounts receivable totaling millions of dollars – for $6,000.00. A copy of the December 30, 2009 "Stock Purchase Agreement" is annexed hereto as Exhibit "8".

88.     In keeping with the fact that the putative "Stock Purchase Agreement" was a sham designed to permit the Management Defendants to continue to attempt collection on NY Dx's pending billing, notwithstanding Lipovsky's impending plea agreement in the Kagan Action:

(i)     the "Stock Purchase Agreement" was executed less than one week before Lipovsky entered into the plea agreement;

(ii)    the supposed consideration paid by Olmedo for NY Dx – just $6,000.00 – was completely inadequate in relation to the millions of dollars of supposedly valid accounts receivable held at that time by NY Dx;

(iii)   NY Dx never filed the requisite documents with the Education Department to record the purported change in ownership from Lipovsky to Olmedo, and Lipovsky continues to be listed as NY Dx's putative owner (a copy of the pertinent search results from the Education Department's Office of the Professions website is annexed hereto as Exhibit "9"); and

(iv)    Olmedo – much like Lipovsky – was completely unqualified by training or experience to own NY Dx, operate NY Dx, or to supervise the radiologists who purported to provide radiology services on behalf of NY Dx, because she was a psychiatrist, not a radiologist.

89.     In fact, Olmedo never paid any money to Lipovsky in connection with her purported acquisition of Lipovsky's nominal ownership interest in NY Dx, because Olmedo did not actually acquire any ownership interest in NY Dx, and Lipovsky did not have any ownership interest to sell.

90.     Rather, following the supposed "transfer" of NY Dx from Lipovsky to Olmedo, the Management Defendants retained their illegal ownership interest in and control over the professional corporation.

91.     Like Lipovsky before her, Olmedo never was the true shareholder, director, or officer of NY Dx, and never had any true ownership interest in or control over the professional corporation. True ownership and control over NY Dx continued to rest entirely with the Management Defendants, who continued to use the façade of NY Dx to do indirectly what they

were forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

92.     Like Lipovsky before her, Olmedo exercised absolutely no control over or ownership interest in NY Dx. All decision-making authority relating to the operation and management of NY Dx continued to be vested entirely with the Management Defendants.

93.     In addition, like Lipovsky before her, Olmedo never controlled or maintained any of NY Dx's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of NY Dx's financial affairs; never hired or supervised any of NY Dx's employees or independent contractors; and was completely unaware of the most fundamental aspects of how NY Dx operated.

94.     Like Lipovsky, Olmedo had a history of involvement in no-fault insurance fraud schemes. For instance, in addition to her purported ownership of NY Dx, Olmedo simultaneously purported to own and practice through at least five other medical professional corporations, all of which were used to submit fraudulent no-fault insurance billing, and several of which were incorporated within only a few months of the purported transfer of NY Dx from Lipovsky to Olmedo. Specifically:

> (i)     Comprehensive Upper East Side Medical Care, P.C. – Incorporated on November 30, 2007;
>
> (ii)    Personal Touch Medical, P.C. – Incorporated on July 31, 2008;
>
> (iii)   Sunlight Medical of Brooklyn, P.C. – Incorporated on November 30, 2009;
>
> (iv)    Bronx Medical Arts, P.C. – Incorporated on December 30, 2009; and
>
> (v)     Turnbull Medical Care, P.C. – Incorporated on February 9, 2010.

95. There was no legitimate reason for Olmedo to serially incorporate multiple medical professional corporations with different tax identification numbers under her name. Rather, multiple medical professional corporations serially were incorporated under Olmedo's name in order to reduce the volume of fraudulent no-fault insurance billing submitted through any one professional corporation, and thereby avoid detection.

96. Not only did Olmedo permit multiple medical professional corporations to be incorporated under her name so as to facilitate the submission of fraudulent no-fault insurance billing, she also worked at fraudulent professional corporations incorporated under the names of other physicians.

97. For instance, in Government Employees Insurance Co. et al v. Threeonix Supply Corp. et al., E.D.N.Y. Docket No. 1:11-cv-03781-KAM-VVP, GEICO sued Olmedo, among others, after Olmedo, in exchange for kickbacks, prescribed large amounts of medically unnecessary durable medical equipment while working at yet another fraudulent medical professional corporation called Cure Medical Services, P.C.

98. In keeping with the fact that Olmedo exercised no genuine ownership interest in or control over NY Dx, she – like Lipovsky before her – never actually practiced medicine through the professional corporation.

99. For instance, none of the thousands of fraudulent no-fault insurance charges submitted through NY Dx to GEICO were for medical services provided by Olmedo. Rather, all of the thousands of fraudulent no-fault insurance charges submitted through NY Dx to GEICO were for radiology services that were provided – to the extent that they were provided at all – by radiologists whom the Defendants treated as independent contractors.

100.    Indeed, much like Lipovsky before her, Olmedo could not have actually performed any of the services that were provided through NY Dx, because all of the services provided through NY Dx were radiology services, and Olmedo – who was a psychiatrist, not a radiologist – lacked the training and education necessary to perform radiology services.

101.    Furthermore, Olmedo – like Lipovsky – could not have supervised any of the radiologists who did perform – or who purported to perform – radiology services on behalf of NY Dx, because, as a non-radiologist, she lacked the training and education necessary to supervise the performance of radiology services.

102.    Indeed, much like Lipovsky, Olmedo did not even have the elementary training in MRI use that some physicians receive in medical school. Rather, Olmedo attended medical school in Mexico, at the Universidad Autónoma de Guadalajara, and graduated in 1976 – years before MRIs became available for diagnostic use, much less part of any medical school curriculum.

103.    In keeping with the fact that the Management Defendants retained their illegal ownership interest in and control over NY Dx, notwithstanding Olmedo's purported acquisition of Lipovsky's nominal or "paper" ownership interest in the professional corporation, the  phony "management," "billing," "marketing," and "lease" agreements between NY Dx and the Management Defendants remained in effect, despite the putative change in ownership of NY Dx.

104.    As had been the case when Lipovsky served as the nominal or "paper" owner of NY Dx, these agreements continued to call for exorbitant payments from NY Dx to the Management Defendants, for the lease of space and equipment at the 198 Foster Avenue Location, and for the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of NY Dx's business; or (ii) the income generated by the professional corporation.

105.    As had been the case when Lipovsky served as the nominal or "paper" owner of NY Dx, while these agreements ostensibly were created to permit the Management Defendants to provide "management," "billing," and "marketing," services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own NY Dx; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through NY Dx.

106.    The net effect of these "management," "billing," "marketing," and "lease" agreements continued to be to maintain NY Dx in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

## C.    Weinberg's Fraudulent Venture With the Management Defendants and Olmedo's Death

107.    In early 2009, once NY Dx was fraudulently incorporated and had begun to submit large-scale fraudulent no-fault insurance billing to GEICO and other insurers, the Management Defendants grew concerned that they would be unable to find an attorney to pursue collection of NY Dx's fraudulent billing, because there would be no way for them to conceal their illegal ownership of and control over NY Dx from an attorney representing the practice, and because any legitimate attorney would refuse the engagement or withdraw upon learning of their fraudulent scheme.

108.    Accordingly, in early 2009 the Management Defendants recruited Weinberg, who was willing to participate in the scheme and pursue collection of NY Dx's fraudulent billing

despite his actual knowledge that NY Dx was not eligible to bill for or to collect No-Fault Benefits because it secretly and unlawfully was owned and controlled by unlicensed non-physicians.

109.     The Management Defendants knew that Weinberg would be amenable to participation in their scheme because his long professional disciplinary record and history of purporting to act on behalf of other healthcare providers without any actual authority to do so indicated that he would be willing to engage in fraudulent conduct in exchange for a financial benefit.

110.     Weinberg was amenable to participation in the fraudulent scheme because his professional disciplinary record, and the publicity attendant to his professional disciplinary record, made it difficult for him to obtain business.

111.     Weinberg also was amenable to participation in the fraudulent scheme because the Management Defendants agreed to share the proceeds of any successful collections with him in the form of both up-front fees associated with the billing and back-end fees over and above those to which he would otherwise be entitled to under the No-Fault Laws, and because the Management Defendants agreed to provide him with decision-making authority in the operation and management of the scheme.

112.     Beginning in 2009, in collusion with the Management Defendants, Weinberg began to file and prosecute collections actions against GEICO, purportedly on behalf of NY Dx. A chart setting forth the collections actions filed by Weinberg since 2009 is annexed hereto as Exhibit "10".

113.     In each such lawsuit, Weinberg filed a complaint, in which he falsely certified that "to the best of my knowledge, information and belief, formed after an inquiry reasonable

under the circumstances, the within Summons and Verified Complaint are not frivolous and this action was not obtained through illegal conduct … ."

114.    In actuality, Weinberg always was fully aware of the fact that NY Dx was fraudulently incorporated, illegally owned and controlled by the Management Defendants, and therefore was ineligible to bill for or to collect No-Fault Benefits in the first instance.

115.    Furthermore, Weinberg never conducted any inquiry, reasonable or otherwise, into whether the collections lawsuits he commenced were frivolous or obtained through illegal conduct, which they were.

116.    In keeping with the fact that Weinberg knew that the Management Defendants secretly and unlawfully owned and controlled NY Dx, notwithstanding Lipovsky's and, later, Olmedo's nominal ownership of the professional corporation, Weinberg never had any relationship with either Lipovsky or Olmedo. Rather, his relationship was with the Management Defendants, who engaged him and with whom he colluded to collect on the fraudulent NY Dx billing and to conceal the Defendants' scheme.

117.    In keeping with the fact that Weinberg never had any relationship with Lipovsky or Olmedo, and in keeping with the fact that he knew the Management Defendants secretly and unlawfully owned and controlled NY Dx, Weinberg purported to represent NY Dx when it was nominally owned on paper by Lipovsky, when it was nominally owned on paper by Olmedo, and – as alleged more fully below – after Olmedo died, without the knowledge or permission of Olmedo's estate. The Management Defendants were the only constant in NY Dx's affairs during this period.

118.     As alleged above, Olmedo was receptive to the Management Defendants' request that she assume nominal or "paper" ownership of NY Dx from Lipovsky because – among other things – Olmedo was seriously ill and not of sound mind.

119.     By late February 2010, less than three months after Olmedo took over from Lipovsky as the nominal or "paper" owner of NY Dx, the Management Defendants and Weinberg grew concerned that Olmedo would soon die.

120.     The Management Defendants and Weinberg were concerned that Olmedo would die because – as the nominal sole shareholder of NY Dx – Olmedo's death would divest NY Dx of the ability to pursue collection of the millions of dollars in pending fraudulent no-fault insurance billing that the Management Defendants had submitted or caused to be submitted through NY Dx, at least until someone with authority over Olmedo's estate, such as her executor, authorized NY Dx to proceed with the collections efforts. See, e.g., N.Y. Bus. Corp. Law §§ 1507, 1510, 1511; see also Ocean Diagnostic Imaging, P.C. v. Merchants Mut. Ins. Co., 15 Misc. 3d 9 (A.T. 2d Dep't 2007).

121.     In particular, the Management Defendants and Weinberg were concerned that – if Olmedo died – only the executor of her estate would have the authority to permit NY Dx to proceed in its attempts to collect on its pending billing, and that the executor of Olmedo's estate would: (i) not permit NY Dx's collections efforts to proceed without requiring any monies that were collected to be paid over to Olmedo's estate; and (ii) require an accounting for any no-fault insurance benefits that NY Dx collected during the period in which Olmedo served as the nominal or "paper" owner of the professional corporation.

122.     Accordingly, in early 2010, the Management Defendants and Weinberg entered into a secret scheme designed to permit them to continue to submit billing through NY Dx, to

pursue collection of the billing, and to conceal the Management Defendants' illegal ownership of and control over NY Dx in the event of Olmedo's death.

123.     Toward that end, on March 1, 2010, the Management Defendants and Weinberg arranged to have Olmedo and NY Dx enter into a fraudulent "Agreement of Sale" with Alta, whereby Alta purported to purchase and take assignment of all of NY Dx's outstanding accounts receivable – i.e., the value of all of NY Dx's pending and unpaid no-fault insurance billing. A copy of the "Agreement of Sale" is annexed hereto as Exhibit "11".

124.     Weinberg prepared the "Agreement of Sale", in collusion with the Management Defendants.

125.     In keeping with the fact that NY Dx was illegally owned and controlled by the Management Defendants, and illegally split fees with the Management Defendants, and in keeping with the fact that Weinberg knew of this illegality, the fraudulent "Agreement of Sale" provided, in substance, that Alta would purchase and take assignment of NY Dx's pending receivables – which at the time amounted to millions of dollars – for just one dollar. See Exhibit "11".

126.     Despite Alta's supposed "purchase" of NY Dx's millions of dollars of accounts receivable for just one dollar, the Management Defendants and Weinberg remained concerned that, as an unlicensed non-physician, Alta lacked standing to pursue collection of no-fault insurance billing.

127.     The Management Defendants and Weinberg also remained concerned that – upon Olmedo's death – NY Dx itself would be powerless to pursue collection on any of its pending billing unless and until the executor of Olmedo's estate authorized collections efforts.

128.     The Management Defendants and Weinberg also remained concerned that, upon

Olmedo's death, the executor of her estate would: (i) not permit NY Dx's collections efforts to

proceed without requiring any monies that were collected to be paid over to Olmedo's estate; and

(ii) require an accounting for any no-fault insurance benefits that NY Dx collected during the

period in which Olmedo served as the nominal or "paper" owner of the professional corporation.

129.     Accordingly, as a concomitant step in their scheme, the Management Defendants

and Weinberg conspired to conceal the existence of the "Agreement of Sale" whereby Alta

purported to purchase NY Dx's accounts receivable, in a manner that would continue to permit the

Management Defendants and Weinberg to collect the accounts receivable.

130.     Specifically, on or about March 1, 2010, when Olmedo, NY Dx, and Alta entered

into the putative "Agreement of Sale", the Management Defendants and Weinberg also caused

Olmedo and NY Dx to enter into a purportedly irrevocable "Retainer Agreement" with Weinberg.

See Exhibit "11".

131.     Pursuant to the "Retainer Agreement" and the "Agreement of Sale":

(i)     NY Dx and Olmedo purported to retain Weinberg to pursue collection of the
        NY Dx accounts receivable, despite the fact that – concomitantly – they had
        purported to sell and assign all of the NY Dx accounts receivable to Alta;
        and

(ii)    NY Dx and Olmedo purported to "irrevocably direct" Weinberg to deposit
        any money he managed to collect on the NY Dx accounts receivable into
        Weinberg's Trust IOLA account, and then to disburse the funds either to
        Alta, or to Alta's designee.

(iii)   NY Dx and Olmedo represented and warranted that, in the event that any
        insurance company made payment on the NY Dx accounts receivable
        directly to NY Dx or Olmedo, rather than to Weinberg, then the payments
        would be withdrawn from the NY Dx account and paid over to Weinberg.

(iv)    NY Dx and Olmedo represented and warranted that they would "cooperate
        with Amos Weinberg [sic] collection efforts throughout such process and
        execute, without charge, any and all such documents as may be reasonably

required in the opinion of Amos Weinberg to be executed and to appear for such depositions or such court appearances requested by Amos Weinberg." However, the "Agreement of Sale" also provided that "[a]ll reasonable efforts will be made by Amos Weinberg to eliminate such personal appearances whenever possible."

(v) In the event that NY Dx and Olmedo failed to "cooperate fully with Amos Weinberg and or [Alta]", then they would be jointly and severally liable to Alta for its "losses", including attorneys' fees.

See Exhibit "11".

132.     Through these machinations, the Management Defendants and Weinberg hoped to continue to pursue collection of NY Dx's pending fraudulent billing in the event that Olmedo died.

133.     In April 2010, shortly after executing the purported "Agreement of Sale", Olmedo died.

134.     Weinberg and the Management Defendants knew that Olmedo had died, and knew that Olmedo's death divested NY Dx of the right to pursue collection on its billing without authorization from Olmedo's estate, which they had neither sought nor obtained.

135.     What is more, even if Olmedo had not died, Weinberg and the Management Defendants knew that – pursuant to the "Agreement of Sale" they prepared in collusion with one another – Alta purported to purchase NY Dx's accounts receivable, divesting NY Dx of any standing to pursue collection of the accounts receivable.

136.     Even so, Weinberg and the Management Defendants nonetheless continued to file collections complaints against GEICO and other insurers in an attempt to collect on the fraudulent billing submitted through NY Dx. See Exhibit "10".

137.     In each such collections complaint, Weinberg falsely verified that he was the attorney for NY Dx, and that he had made a reasonable inquiry and had determined that the action was not frivolous or obtained through illegal conduct.

138.    In actuality, Weinberg always was fully aware of the fact that NY Dx was fraudulently incorporated, illegally owned and controlled by the Management Defendants, and therefore was ineligible to bill for or to collect No-Fault Benefits in the first instance.

139.    Furthermore, Weinberg never conducted any inquiry, reasonable or otherwise, into whether the collections lawsuits he commenced were frivolous or obtained through illegal conduct, which they were.

140.    In keeping with the fact that Weinberg was aware that NY Dx was illegally owned and controlled by the Management Defendants, and in keeping with the fact that he had not conducted any inquiry into the legality of the collections lawsuits he commenced, the attorney for Olmedo's estate, an attorney named Seth Rubenstein ("Rubenstein"), never met Weinberg and did not have the slightest idea that: (i) Olmedo was the nominal owner of record of NY Dx; (ii) NY Dx was continuing to pursue collection of its pending billing; or (iii) Weinberg had been retained to pursue collection of the pending NY Dx billing.

141.    The Management Defendants and Weinberg knew that – if either the Education Department or Rubenstein learned that Olmedo had assumed Lipovsky's nominal or "paper" ownership of NY Dx – they would not be able to continue to enact their fraudulent scheme.

142.    In particular, if the Education Department learned that Olmedo had assumed nominal ownership of NY Dx, it would begin to list Olmedo as the owner of the professional corporation on its website, which in turn would lead insurers to question NY Dx's authority to pursue collection of its billing in light of Olmedo's death.

143.    Likewise, any public record evincing Olmedo's nominal ownership of NY Dx would lead Rubenstein or other representatives of Olmedo's estate to challenge the legality of the "Agreement of Sale", and to assert that Olmedo's estate continued to own the NY Dx receivables.

144.    Accordingly, to further conceal their scheme from insurers, the Education Department, and Olmedo's estate, the Management Defendants – who controlled NY Dx and all of its books and records – caused NY Dx to fail to file the requisite triennial statement, pursuant to N.Y. Bus. Corp. Law § 1514, evincing the change in nominal ownership of the professional corporation from Lipovsky to Olmedo.

**D.    Lipovsky's and Olmedo's Failure to Practice Medicine Through NY Dx, and the Fraudulent Billing for Independent Contractor Services**

145.    N.Y. Bus. Corp. Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. In particular, Section 1507 provides, in pertinent part, as follows:

> Issuance of shares
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued … . All shares issued, agreements made, or proxies granted in violation of this section shall be void.

146.    Legislative history confirms that the physician-owner of a medical professional corporation not only must be licensed to practice medicine but must also be engaged in the practice of medicine in the professional corporation. For example, in commenting on the proposed amendment to Section 1507 in 1971, the New York State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

147.    Similarly, the New York Department of State commented that:

Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.

The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

148.    New York's Department of Health was of the same opinion, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

149.    As alleged above, Lipovsky and Olmedo did not actually practice medicine through NY Dx.

150.    Indeed, as noted above, Lipovsky and Olmedo could not actually practice medicine through NY Dx, inasmuch as NY Dx was a radiology provider, and they lacked the training and education necessary to either perform radiology services or to supervise radiologists.

151.    In keeping with these facts, none of the thousands of charges submitted through NY Dx to GEICO were for services provided by Lipovsky or Olmedo.

152.    Rather, all of the services allegedly provided through NY Dx were provided – to the extent that they were provided at all – by radiologists whom the Management Defendants, NY Dx, Lipovsky, and Olmedo treated as independent contractors.

153.    Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

154.    Since 2001, the New York State Insurance Department (now the Department of Financial Services) consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare

providers performing services as independent contractors. <u>See</u> <u>DOI Opinion Letter</u>, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); <u>DOI Opinion Letter</u>, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); <u>DOI Opinion Letter</u>, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals); <u>See</u> <u>DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "12").

155. Lipovsky and Olmedo were the only physicians who ever were employed by NY Dx, to the extent that their service as the nominal or "paper" owners of the professional corporation legitimately can be denominated as "employment" in the first instance.

156. Even so, the Management Defendants, NY Dx, Lipovsky, and Olmedo routinely submitted charges to GEICO and other insurers on behalf of NY Dx for Fraudulent Services performed by physicians other than Lipovsky and Olmedo.

157. To the extent that they were performed in the first instance, all of the Fraudulent Services performed by physicians other than Lipovsky or Olmedo were performed by physicians

whom the Management Defendants, NY Dx, Lipovsky, and Olmedo treated as independent contractors.

158.    For instance, the Management Defendants, NY Dx, Lipovsky, and Olmedo:

(i)      paid the physicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the physicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the physicians;

(iv)     failed to secure and maintain W-4 or I-9 forms for the physicians;

(v)      failed to withhold federal, state or city taxes on behalf of the physicians;

(vi)     compelled the physicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the physicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the physicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)     failed to cover the physicians for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians were independent contractors.

159.    By electing to treat the physicians as independent contractors, the Management Defendants, NY Dx, Lipovsky, and Olmedo realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

<ol type="i" start="3">
<li>avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);</li>
<li>avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;</li>
<li>avoiding the need to secure any malpractice insurance; and</li>
<li>avoiding claims of agency-based liability arising from work performed by the physicians.</li>
</ol>

160. Because the physicians were independent contractors and performed the Fraudulent Services, the Management Defendants, NY Dx, Lipovsky, and Olmedo never had any right to bill for or collect No-Fault Benefits in connection with those services.

161. The Management Defendants, NY Dx, Lipovsky, and Olmedo billed for the Fraudulent Services as if they were provided by actual employees of NY Dx to make it appear as if the services were eligible for reimbursement. These misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.  The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO, and Weinberg's Collusion With the Management Defendants**

162. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through NY Dx to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

163. The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

<ol type="i">
<li>The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, NY Dx was not properly licensed in that it was a medical professional corporation that was</li>
</ol>

fraudulently incorporated and unlawfully was owned and controlled by the Management Defendants, who are not licensed physicians.

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, NY Dx was not properly licensed in that it was a medical professional corporations that illegally split fees with the Management Defendants, who are not licensed physicians.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, NY Dx was not properly licensed in that it was a medical professional corporations that was nominally owned on paper by two physicians who did not actually practice medicine through the professional corporation.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that NY Dx was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Services. In fact, NY Dx was not eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Services, because the Fraudulent Services were performed – to the extent that they were performed at all – by independent contractors, rather than by NY Dx's employees.

164.    Moreover, and in collusion with the Management Defendants, Weinberg commenced and prosecuted dozens of collections lawsuits in an attempt to collect upon the fraudulent billing submitted through NY Dx, and falsely verified the collections complaints, with the actual knowledge that:

(i)      NY Dx was not lawfully licensed and, therefore, was ineligible to bill for or to collect No-Fault Benefits; and

(ii)     He lacked the authority to represent NY Dx.

165.    Weinberg engaged in the deceitful conduct and made the fraudulent misrepresentations in order to: (i) attempt to illegally force GEICO to pay money on the fraudulent NY Dx claims as an alternative to incurring the costs of litigation; and (ii) collect

legal fees from GEICO associated with hundreds of lawsuits that are predicated on the fraudulent claims.

**III.**     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

166.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

167.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

168.     Specifically, they knowingly misrepresented and concealed facts related to NY Dx, Lipovsky, and Olmedo in an effort to prevent discovery that NY Dx was unlawfully incorporated, owned and controlled by non-physicians, engaged in illegal fee splitting, was nominally owned on paper by physicians who did not practice medicine through it, and therefore was ineligible to bill for or collect No-Fault Benefits.

169.     For example, the Defendants misrepresented Lipovsky's and Olmedo's ownership of and control over NY Dx in filings with the New York State Department of Education, and concealed the Management Defendants' illegal interests in NY Dx, so as to induce the Department of Education to issue the license required to permit medicine to be practiced through NY Dx.

170.     Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the Management Defendants' true ownership of and control over NY Dx and fee splitting with NY Dx.

171.     Likewise, in every verified bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that NY Dx properly was incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact it was not.

172.     In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians associated with NY Dx in order to prevent GEICO from discovering that the physicians performing many of the Fraudulent Services – to the extent that they are performed at all – were not employed by NY Dx.

173.     Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.  Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

174.     GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

175.     In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet the Defendants failed to comply with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

176.     The Defendants have hired attorneys and law firms – including Weinberg – to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms

routinely filed expensive, time-consuming, and frivolous litigation against GEICO and other insurers if the charges were not promptly paid in full.

177. For instance, in one case – <u>New York Diagnostic Med. Care P.C. v. GEICO Cas.Ins. Co.</u>, 2010 NY Slip Op 30360(U) (Sup. Ct. N.Y. Cty. 2010) – the Defendants sought collection on more than $40,000.00 in pending billing they submitted through NY Dx.

178. The Defendants – in collusion with Weinberg – caused NY Dx to move for summary judgment specifying that it had established its prima facie case for purposes of trial, and also for an order dismissing GEICO's affirmative defense that the billed-for services were not medically necessary.

179. The only proof that the Defendants submitted in support of their motion was Rubin's affidavit, dated March 24, 2009, in which he characterized himself as the "medical biller and billing manager" for NY Dx "since its inception", but failed to either make out NY Dx's prima facie case or rebut GEICO's affirmative defense of lack of medical necessity. The Court denied the motion.

180. The reason why the Defendants submitted Rubin's affidavit in support of NY Dx's motion for summary judgment, rather than an affidavit from Lipovsky, who purportedly owned NY Dx at the time, or affidavits from the physicians who actually purported to perform the underlying MRI services, is because Lipovsky had no genuine ownership interest in NY Dx, and the physicians who purported to perform the underlying MRIs were independent contractors, rather than NY Dx employees who could be required to attest to the medical necessity of the services they supposedly provided.

181. In another action, <u>New York Diagnostic Medical Care, P.C. v. GEICO Casualty Insurance Co.</u>, Index No. 650766/2013 (Sup. Ct. N.Y. Cty.)(the "2013 Action"), the Defendants

– again, represented by Weinberg – sought collection on hundreds of claims they had submitted through NY Dx, based on a contention that GEICO improperly had denied the claims based on peer reviews of the claims.

182.    GEICO moved to dismiss, observing – among other things – that the 2013 Action was predicated entirely on the theory that GEICO could not legally use peer reviews to deny no-fault insurance claims, and that NY Dx, again represented by Weinberg, had advanced this same theory in a previous case, where it had been completely rejected by the Court.

183.    The Supreme Court, New York County granted GEICO's motion to dismiss the 2013 Action, with prejudice.

184.    Undeterred, the Defendants – once again represented by Weinberg – filed another action entitled New York Diagnostic Medical Care, P.C. v. GEICO Casualty Insurance Company, Index No. 706036/2014 (Sup. Ct. Queens Cty.)(the "2014 Action"), in which they once again sought collection on hundreds of claims they had submitted through NY Dx, again based on a contention that GEICO improperly had denied the claims based on peer reviews of the claims.

185.    The 2014 Action was predicated for the most part on the same denied claims that had been the subject of the 2013 Action, which was dismissed with prejudice.

186.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

187.    The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.

188.     As a result, GEICO incurred damages of more than $665,000.00 based upon the fraudulent charges submitted through NY Dx, as well as more than $250,000.00 in legal fees and disbursements that the Defendants caused GEICO to incur by commencing dozens of lawsuits against GEICO in an attempt to collect on their fraudulent charges for the Fraudulent Services.

189.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**FIRST CAUSE OF ACTION**</u>
**Against NY Dx**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

190.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 189 above.

191.     There is an actual case in controversy between GEICO and NY Dx regarding more than $1,500,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

192.     NY Dx has no right to receive payment for any pending bills submitted to GEICO because NY Dx was fraudulently incorporated, unlawfully licensed, and illegally owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits.

193.     NY Dx has no right to receive payment for any pending bills submitted to GEICO because NY Dx engaged in illegal fee-splitting with non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits.

194.     NY Dx has no right to receive payment for any pending bills submitted to GEICO because NY Dx nominally was owned on paper by physicians who did not actually practice

medicine through the professional corporation and, therefore, is ineligible to bill for or to collect no-fault insurance benefits.

195.     NY Dx has no right to receive payment for any pending bills submitted to GEICO because NY Dx sold and assigned its right to collect no-fault insurance benefits to unlicensed non-physicians and, therefore, lacks standing to bill for or to collect no-fault insurance benefits.

196.     NY Dx has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services – to the extent that they were performed at all – were performed by independent contractors, rather than by NY Dx's employees.

197.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because:

(i)     NY Dx was fraudulently incorporated, unlawfully licensed, and illegally owned and controlled by non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(ii)    NY Dx engaged in illegal fee-splitting with non-physicians and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iii)   NY Dx nominally was owned on paper by physicians who did not actually practice medicine through the professional corporation and, therefore, is ineligible to bill for or to collect no-fault insurance benefits;

(iv)    NY Dx sold and assigned its right to collect no-fault insurance benefits to unlicensed non-physicians and, therefore, lacks standing to bill for or to collect no-fault insurance benefits; and

(v)     the Fraudulent Services – to the extent that they were performed at all – were performed by independent contractors, rather than by NY Dx's employees.

**SECOND CAUSE OF ACTION**
**Against Lipovsky and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

198.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 197 above.

199.     New York Diagnostic Medical Care, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

200.     Lipovsky, Rubin, Alta, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of NY Dx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over 19 months seeking payments that NY Dx was not eligible to receive under the No-Fault Laws because: (i) NY Dx was fraudulently incorporated and illegally owned and controlled by non-physicians; (ii) NY Dx illegally split fees with non-physicians; (iii) NY Dx was nominally owned on paper by physicians who did not actually practice medicine through the professional corporation; and (iv) the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by NY Dx's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

201.     NY Dx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lipovsky, Rubin, Alta, and John Doe Defendants 1-10 operated NY Dx, inasmuch as NY Dx never has been eligible to bill for or to collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for NY Dx to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of

continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NY Dx to the present day.

202.     NY Dx is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NY dx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

203.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $665,000.00 pursuant to the fraudulent bills submitted through NY Dx.

204.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Lipovsky, the Management Defendants, and Weinberg
### (Violation of RICO, 18 U.S.C. § 1962(d))

205.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 204 above.

206.     New York Diagnostic Medical Care, P.C.  is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

207.     Lipovsky, Rubin, Alta, John Doe Defendants 1-10, and Weinberg are employed by and/or associated with the NY Dx enterprise.

208.     Lipovsky, Rubin, Alta, John Doe Defendants 1-10, and Weinberg knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of NY Dx's affairs through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over 19 months seeking payments that NY Dx was not eligible to receive under the No-Fault Laws because: (i) NY Dx was fraudulently incorporated and illegally owned and controlled by non-physicians; (ii) NY Dx illegally split fees with non-physicians; (iii) NY Dx was nominally owned on paper by physicians who did not actually practice medicine through the professional corporation; and (iv) the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by NY Dx's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

209.    Lipovsky, Rubin, Alta, John Doe Defendants 1-10, and Weinberg knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO, and by pursuing collection of the fraudulent charges despite their actual knowledge that the fraudulent charges were unreimbursable.

210.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $665,000.00 pursuant to the fraudulent bills submitted through NY Dx.

211.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against NY Dx, Lipovsky, and the Management Defendants
### (Common Law Fraud)

212.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 211 above.

213.     Lipovsky, Rubin, Alta, and John Doe Defendants 1-10, knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

214.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, NY Dx was not properly licensed in that it was a medical professional corporations that was fraudulently incorporated and unlawfully was owned and controlled by the Management Defendants, who are not licensed physicians.

(ii)     In every claim, the representation that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, NY Dx was not properly licensed in that it was a medical professional corporations that illegally split fees with the Management Defendants, who are not licensed physicians.

(iii)    In every claim, the representation that NY Dx was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, NY Dx was not properly licensed in that it was a medical professional corporations that was nominally owned on paper by two physicians who did not actually practice medicine through the professional corporation.

(iv)     In every claim, the representation that NY Dx was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Services. In fact, NY Dx was not eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Services, because the Fraudulent

Services were performed – to the extent that they were performed at all – by independent contractors, rather than by NY Dx's employees.

215.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NY Dx that were not compensable under the No-Fault Laws.

216.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $665,000.00 pursuant to the fraudulent bills submitted through NY Dx.

217.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

218.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Weinberg
### (Aiding and Abetting Fraud)

219.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 218 above.

220.     Weinberg knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the NY Dx, Lipovsky, and the Management Defendants.

221.     The acts of Weinberg in furtherance of the fraudulent scheme include: (i) knowingly creating and filing false and fraudulent verifications in connection with No-Fault collections lawsuits; (ii) knowingly pursuing collection of the fraudulent billing submitted through NY Dx despite his actual knowledge that he was not authorized to pursue collection of the billing, that NY Dx lacked standing to pursue collection on the billing, and his actual

knowledge that the billing was fraudulent; and (iii) facilitating the concealment of the fraudulent scheme, by concealing the ultimate disposition of the proceeds of the scheme.

222.    The conduct of Weinberg in furtherance of the fraudulent scheme was significant and material. The conduct of Weinberg was a necessary part of and was critical to the success of the fraudulent scheme because without his actions, there would be no opportunity for NY Dx, Lipovsky, and the Management Defendants to obtain payment from GEICO and from other insurers.

223.    Weinberg aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NY Dx for services that were not compensable under the No-Fault Laws, because he sought to continue profiting through the fraudulent scheme.

224.    The conduct of Weinberg caused GEICO to pay at least $665,000.00 pursuant to the fraudulent billing submitted through NY Dx.

225.    Weinberg's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

226.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Weinberg**
**(Violation of New York Jud. Law § 487)**

227.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 226 above.

228.    New York Judiciary Law § 487 provides, in pertinent part, as follows:

> An attorney or counselor who … Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party… [i]s

guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

229.     Beginning in early 2009, Weinberg colluded with the Management Defendants to prosecute collection actions against GEICO in the New York Court system to force GEICO to make payment on claims that NY Dx no right to collect and to pay legal fees associated with the prosecution of the collection actions.

230.     Based upon this fraudulent billing, since mid-2009 Weinberg has commenced and pursued dozens of lawsuits against GEICO in the New York City Civil Court system, purportedly on behalf of NY Dx. See Exhibit "10".

231.     Weinberg colluded with the Management Defendants to commence and pursue each and every one of these lawsuits, and continue to pursue these lawsuits, and then to conceal the Defendants' fraudulent scheme, with the knowledge NY Dx was not entitled to collect the charges at issue because, and – with respect to every lawsuit commenced after April 2010 – with the knowledge that he was not authorized to represent NY Dx in the first instance.

232.     Weinberg engaged in the deceitful conduct and made the fraudulent misrepresentations for the purpose of: (i) attempting to illegally force GEICO to pay money on claims relating to NY Dx as an alternative to incurring the costs of litigation; and (ii) to collect legal fees from GEICO associated with lawsuits that were predicated on the fraudulent claims.

233.     As a result of the deceitful and fraudulent conduct of Weinberg as described more fully herein, GEICO has been injured in an amount to be established at trial but believed to exceed $250,000.00.

234.     By reason of the foregoing, GEICO is entitled to monetary damages against Weinberg, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law § 487.

## SEVENTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

235.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 234 above.

236.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

237.     When GEICO paid the bills and charges submitted by or on behalf of NY Dx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

238.     The Defendants have been enriched at GEICO's expense by GEICO's payments which constitute a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

239.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

240.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $665,000.00.

## JURY DEMAND

241.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor, as follows:

A.   On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NY Dx has no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Lipovsky, Rubin, Alta, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $665,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Lipovsky, Rubin, Alta, John Doe Defendants 1-10, and Weinberg compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $665,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.   On the Fourth Cause of Action against NY Dx, Lipovsky, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $665,000.00,  together with punitive damages, costs, and interest;

E.   On the Fifth Cause of Action against Weinberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $665,000.00, together with punitive damages, costs, and interest;

F.   On the Sixth Cause of Action against Weinberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $250,000.00, together with treble damages, reasonable attorneys' fees, interest, and such other and further relief as this Court deems just and proper; and

G.      On the Fifth Cause of Action against all Defendants, more than $665,000.00 in compensatory damages, plus costs and interest.

Dated: November 26, 2014

RIVKIN RADLER LLP

By:_____/s/_____
      Barry I. Levy (BL 2190)
      Max Gershenoff (MG 4648)
      Michael Schnepper (MS 6953)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company and GEICO Casualty Co.*